The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Mr. McDonnell, are you ready? Thank you very much. It pleases the Court. David McDonnell on behalf of the Plaintiffs Appellant. This case is a tragic example of the circumstances that happen when our social contract is completely broken down and Mr. Price was living in the dystopia that resulted of drug dependency, poverty, desperation. He was picked up on a minor charge, admitted to the jail, underwent... Would you please speak up? Get that microphone as close as possible. Is that better? Is this better? It's better, yeah. That looks good. Thank you. He was admitted to the jail, was picked up with used and unused bundles of heroin. He disclosed that he was a heroin addict and he had ten bundles a day, which is a large amount of heroin and a severe addiction. All of the expert witnesses in this case have agreed that opioid addiction is a medical issue. It is not a moral failing or a character defect. And that he was inappropriately in the jail at Granville County because he was going to go through detox and withdrawal while he was there based on his history and based on their knowledge. How many defendants did you join in this case? Oh, well, we named everybody on the grounds that... Give me the number of defendants that you... I didn't count them up. There probably were 15. Fifteen? Maybe, yes. You sued everybody that worked at the jail, didn't you? Well, we had a problem with the statute of limitations and there is a principle for the bystander liability. We've abandoned that. So could you help me then, just because the defendants argue that you've forfeited many of your claims against many of the defendants, could you just clarify for me what claims are before us now? Yes, Your Honor. Which claims against which defendants? Right. I think that our Monell claim is the strongest claim that we have. We also have a strong... The Monell claim against the county? Yes. They had a policy of some kind in place that resulted in this tragic situation? Well, the evidence of that is not sufficient. This policy is required by North Carolina law to be signed and reviewed annually. I'm still confused about why it was necessary to sue 15 defendants and eight of them you don't even discuss in your brief. We've abandoned that, Your Honor. What? We've abandoned those claims, Your Honor. We're concentrating on the Monell claim and of the three officers who were there and the sheriff. Well, on the face of the brief, all of them are named. They're appelees, defendant's appelees. Everybody worked at the jail. That's correct. But we didn't bring those assignments forward. The trial judge dismissed them. But you accused them of being involved in... The trial judge dismissed them. ...in killing this fellow, basically. Well, we're bringing... I just have a real problem with the way this case was litigated in saving 15 defendants, many of whom were not involved, only tangentially involved. And they're not discussed here on appeal. And then some of them are just... It's just odd. Mr. Carter, for example, who provided aid and medications. When you say it, you admit it's a compassionate act, and yet he still gets sued. The man actually provided aid in a very timely fashion, but he still gets sued. Even if it's admitted that his involvement was purely a compassionate one. And there's just the net... You know, there ought to be some cognizance of the fact that the net is spread so wide. You bring all sorts of people into court. You cause them the anxiety and inconvenience of being named in a suit, which they had an incident which they had nothing to do with, or which they tried to ameliorate. And I just have a problem with litigating a suit in that fashion. Mr. Carter was not trained in what to do. And instead of doing what he should have done, which was to call for a nurse to evaluate Mr. Price, he took it on himself to find some kind of preparation. Was he deliberately indifferent? Yes. Trying to provide medication is deliberately indifferent? Well, because he's not qualified to make a determination what kind of medication he should have. You may think that. But, of course, if he hadn't provided the medication, you would say, well, he was right around there. He could have provided something. He could have provided some assistance. He didn't. But the standard is whether he was deliberately indifferent. And, you know, whether you use an objective test or a subjective test, the deliberate indifference standard has not been repealed. And this man, whatever he was, he may have been mistaken, I don't know. But he was anything but indifferent. What he did do is he provided medication that caused him to vomit immediately. And it made the situation worse. So he made it worse, not better. Even though he acted out of compassion, he recognized that there was a need here, a medical need. And he took an inappropriate action. And the reason that he took the inappropriate action was that he was not trained. And the county's own expert witness said that the reason that Mr. Price should not have been in that jail is that there was not one single person there trained to deal with the medical problem that he had. And that is a Monell violation. On the Monell front, can I ask you, the defendants say that it is the defendant's characterization is that based on this record, it is undisputed that there were no opioid-related deaths in this detention facility between 2012 and the time of Mr. Price's death. Do you dispute that? Well, we don't dispute that. But that I don't think is... Well, isn't that pretty relevant to the Monell claim? I mean, I agree it's not dispositive, but it's at least relevant to a Monell claim, right? It should be considered. And I think that the court needs to recognize that there were two different problems here. One was withdrawal and detoxification that took place for hours and hours and hours. Then there was the additional problem that somehow he got fentanyl in the jail. And the expert witnesses both say that he had to have gotten it in the jail. The sheriff said that he couldn't keep drugs out of his jail, and the sheriff didn't do anything about it. After he found out that Mr. Price had died because of fentanyl poisoning, he didn't even open an investigation. There's a lot of hindsight in trying to string up people who tried to make the best of a bad situation. Well, the time that he had been admitted to this jail earlier, they took him to the hospital, they had him evaluated by the medical personnel at the hospital, and he survived. This time, the expert witnesses both say that he should have been medically supervised the entire time, and that if he had been medically supervised, then the likelihood is that he would not have died. That is objectively unreasonable to put him in that situation for the withdrawal and detoxification and to put him in a place where he might have access to fentanyl that would kill him. So can I ask you about the declarations of the cellmates that you submitted? My perception is that some of the things in those declarations to me appear to be blatantly contradicted by the video, and I want to give you a chance to respond. So one of the things those declarations say is that officers ignored the cellmate's call request. That would be concerning. But then I look at the video, and I see that every time there's a call request, a couple minutes later, someone shows up on the video. So I don't know how that can be squared with the claim they ignored call requests when it appears that in response to call requests, people came. What do I do with that? Your Honor, what they say is that when they made these call requests, they called, they pushed the intercom, made a call, and said he needs medical attention. And then someone shows up. But these people are not trained and not qualified. Okay, again, maybe they didn't do the right thing. Maybe they didn't do the good enough thing, but I don't think it's fair to say that when you make a call and then someone comes that they ignored the call request. That doesn't seem like a plausible meaning of the word ignored. It didn't lead to him having medical care that he needed. Well, there is the video evidence, and the video evidence may not show every second. But the video evidence does not show as far as I can see. It may not have a continuous picture of it all, but there was nothing in the video that alerted them, that would have alerted them to this situation. And the district court took a clear account of the video evidence, and it showed nothing that would have, nothing that would have alerted them to a situation that they then were indifferent to or ignored. Dr. McCoy testified that when Carter gave him the medication and he vomited, that that information itself was not enough to ascertain whether he needed Narcan for an overdose or whether he needed something else for withdrawal. And that the difference was the difference between life and death. If it had shown some dire information, that would have been one thing, but it didn't. Well, they said that if he had been medically monitored, then the doctors would have been able to put enough of the evidence together that a layperson with no training is incapable of making the determinations as to how to deal with the detoxification, not the death in the courthouse. The response here was when the gravity of the situation became apparent, the response was timely. At the time that any response occurred, it was too late. They were there a couple of minutes. But it was already too late at that point. They had notice from the other inmates, and this is very clear. They said, you've got to get him some help. This is what the other inmates said that they called. They said, this man is screaming. How can people after the seizure, how can people that are on the scene a minute or two later be deliberately indifferent to someone's plight? Because they were told about this by the other inmates hours before that happened. And there was plenty of time to get him the medical care that he needed. And they didn't do it. But they certainly were on notice because the other inmates asked them to get him medical care, according to their testimony. Now, the sheriff, there's an issue there about the sheriff. Now, the sheriff told the family when he advised them that he knew that Mr. Price was intoxicated when he was admitted and that he couldn't keep drugs out of his jail. Now, those things show that he had personal involvement in this case. Now, this is the same sheriff who was convicted of crimes related to the administration of his office, including falsification of documentation and inappropriate supervision of his drug task force. Now, I think that we've got a claim against the sheriff for deliberate indifference. Thank you, counsel. My time is up for now. We're fine. Thank you. May I reserve? May it please the court. My name is Brian Castro. I represent the defendants at Belize in this case. As this court mentioned, there were 17 named defendants. Thirteen of those were individuals. Of those 13, only three are even mentioned in the brief. Subsequently, we agree that the appropriate process would have been through the amendment process, through discovery if one finds notice of an additional defendant that was actually involved in an incident, they can amend the complaint, not name all 13 at the outset. Now, to give them some grace, that if they sued up against the statute of limitations, that's going to have potential relation back problems, right? Correct. But if it arises out of the same transaction or occurrence, which would be the December 2018 incident, then it would potentially meet the Rule 5C standard. Well, it wouldn't just be that. They'd have to have notice. The true defendant would have had to have notice within the limitations period, right? Correct, within the one. Yes, exactly. The question before this court is whether the district court, in its 1551-page, well-thought-out opinion, correctly ruled that the individual defendants were entitled to qualified immunity, that they did not violate any constitutional rights of the decedent, and that no positive— You know, it's interesting that you mention the 51-page opinion. Exactly. I don't think we can judge these things purely by length. But on the other hand, part of our duty as an appeals court is to make sure that district courts don't just dust these things off or give them the back of a hand. And when somebody writes a careful opinion, 51 pages, goes through each and everything, he did the kind of job with this that we expect our district judges to do. There was no, you know, dusting off or deflection or giving it the back of a hand. Now, I'm not saying that that's dispositive. But what I am saying is that it's something that a court of appeals can take note of, whether a district court was careful or whether a district court was, you know, in a hurry and didn't much care. But I think when a district court goes to the lengths that this district court did in discussing this claim, that's worth something. That's worth something in the way that the process is supposed to work. Absolutely. We agree. And it's indicative of the thorough process that the judge engaged in at the district court level. Of course, this court's analysis on appeal is de novo. But it is worth considering that the chief judge carefully analyzed all the record evidence, including the affidavit submitted by the plaintiffs and the video footage, which, as you all mentioned, is clear and undisputed. And it shows the interactions of the decedent. It shows how he was acting hours before the incident. Can I ask you about probably the thing that troubles me the most about this? So Limerick didn't subject Price to the withdrawal protocol because she determined he was not exhibiting symptoms of an opioid overdose. That seems to me to contradict the declarations of at least some of the cellmates who say it was, quote, obvious that he was high. That's J.A. 1340. How do I square her statement that he was not exhibiting signs with them saying it is obvious he's high? Well, firstly, you can square that by reviewing the footage. I believe it was Deputy Harrison that was the arresting officer, and it clearly depicts Price. And you can first of all – But we're not talking about the arrest. We're talking about when he's in the detention facility. They're saying it's obvious he's high. Right. They're saying that he's obviously high after he's already in the booking process, already in the detention center, the detention facility, not during the inmate booking process. And there's no evidence that anyone perceived him in that state. That would potentially – that would be how you would square that because – Wait. Okay. So he's arrested. He's then brought in. He's processed. And then he's placed in the holding cell. That's the sequence of events, right? Exactly. He's processed by Limerick. Right. And as the plaintiff has conceded and admitted, on a previous occasion, you can also consider that Limerick also conducted the intake and booking process of Price. And on that occasion, she did perceive that he was exhibiting severe withdrawal symptoms, and she did, in accordance with the policy, not allow him to be admitted. The plaintiff concedes this in the brief. You cannot argue that a detention facility, on the one hand, does not have appropriate policies, but then argue that on a previous occasion, when that detention officer – it's their duty upon intake and admittance to visually observe the inmate, conduct the preliminary screening and the questionnaire, and make a determination of whether this person can or cannot be admitted. What about the fact that Limerick wrote on the intake form that he was on 10 bags a day? Doesn't that mean she obviously knows that he's a drug user? That means he's – A regular, frequent, significant drug user, not just a drug user in the abstract. Correct. She knows, and it can be undisputed, and it does not lead to any liability. And we admit that he was a drug user or that he did have a drug problem. However, the question before the court is whether he was exhibiting a serious medical need. This would be – take the – But doesn't it seem really obvious that someone who is a heavy user of opioids, who is then involuntarily forced to go cold turkey, is going to have withdrawal symptoms? Doesn't that seem, well, obvious? It may seem obvious, but the level of the symptoms and the severity of the medical issue is what the court can also focus on, because there are, of course, mild withdrawal symptoms. There are many in the jail context. You would expect on a weekend, let's say, someone is drunk, publicly intoxicated. They're admitted into the jail, and they're placed in the holding cell, and they're withdrawing. However, is it a serious medical need? Is it the shakes? Is he sweating? Is he vomiting? Is he exhibiting convulsions? And that is not what happened here. The video evidence shows that he's walking around, he's showering, speaking to the other inmates, and acting normally. And the plaintiff's expert admitted to all of this in the deposition and stated, he seems to be fine to me. The throwing up doesn't indicate anything. When you take those words, the standard is a serious medical need. Exactly. And that's, you know, it's not anything. And the manifestation of a serious medical need began when he started convulsing. And that was what put them on notice. And then within minutes, people arrived and tried to do the best thing they could for this gentleman. And so the quickness of the response, when they were put on, it was the convulsions that put them on notice. You look at that video, or you read the record here, and there may have been some intoxication or whatever. But in terms of a serious medical need, it was the convulsion that indicated that, yes, the medical need was not just some run-of-the-mill intoxication. Which is true of a lot of jails. People come into a jail very often in an intoxicated state, because that's why they've been misbehaving. And that's why they're brought into the jail. But being intoxicated is not invariably indicative of a serious medical need. But convulsing is indicative of a very serious medical condition that needs prompt attention. And this, they could not have come on the scene any faster than they did. Correct. And the plaintiff's own expert stated that this was one of the fastest reaction times he'd ever seen. It was less than a minute. It was about 50 seconds from the time that he begins exhibiting. Of course, it's important, as Your Honor mentioned, when is there notice of a serious medical need? It's not when he's exhibiting mild withdrawal symptoms. It's not when he's walking around and engaging in conversation and acting normally. It's when the inmates notice that he's convulsing. They pick it on camera. They immediately press the button. The officers come in. Within minutes, within one minute, they come in and respond. And then EMS is called, and EMS arrives within five minutes of the scene. So this cannot be said to be deliberate indifference. Can I say just about the protocol, not about what happened here? I just want to understand what the policy is. When does the protocol say that you're supposed to trigger the withdrawal protocol? What is the thing that is supposed to trigger the withdrawal protocol under the policy? I would have to look at it. I believe it's Section 2.02 or 2.03 of the policy, but it is when they're exhibiting symptoms of severe intoxication or withdrawal is when you— Severe is the—I understand that— It would have to be something of the sort of very need of additional medical attention. Can I follow up on the question I asked you earlier about Limerick? Doesn't one of the declarations, this is J1340, say that he was obviously high when he was admitted? I would have to look back at the—it might be the Perguson affidavit. I'm not sure, but— I don't have it. I don't know the name. It's J1340. I believe it's—that declaration says he was obviously high when he was arrested and when he was admitted. Yes, but even if the court is to take that into account and— Well, don't we have to at summary judgment? Well, you have to unless it's blatantly contradicted by the record, including the body camera footage of Price when he was arrested 30 minutes or so before he was booked. You have to look at that and say, how does he actually look? Does he look like he's obviously high? Secondarily, if someone is high, that's a subjective term in and of itself, obviously high. Is it a serious medical need? Not everyone who's obviously high is going to experience severe withdrawal. Exactly. Not all of them are going to exhibit a serious medical emergency requiring emergency attention by a further action. And the record here, including the video, shows that he's not showing himself to be obviously high or obviously intoxicated. He's not stumbling around. He's not exhibiting any actions that would back up that statement in the declaration that he is actually obviously high. The court ruled in favor of the defendants on multiple grounds. It analyzed Short in detail, each factor, which was the standard enunciated in 2023. But it also noted that Short was not clearly established in December 2018 when this conduct occurred. So this court can affirm the judgment of the district court under either standard, even if Short has been met here. So that's irrelevant. But even if it had not been met, the court can still uphold the district court's decision based on qualified immunity. The policy here, which cleared through state law, it has an emergency plan, a first aid training, substance abuse. It addresses substance abuse services for inmates. I don't think you need a policy. You can have a policy statement that covers all forms of substance abuse. I don't think it would be a requirement that you have a separate policy statement for this drug or that drug or one for one policy statement for opioids and another policy statement for fentanyl and whatever. In other words, I think it, as far as I can tell, that it's a fair enough thing to have a comprehensive policy that covers all forms of substance abuse. Because the symptoms can be a little bit different, but also many of the symptoms overlap. And so I think it makes sense to cover treatment for substance abuse comprehensively. Yes. If you look at the case law, it would even allow for a more general policy than what the detention center has here. One that would actually cover the situation where you're seeing someone who's exhibiting intoxication. Some detention centers even have lesser comprehensive policies. You don't need to have one that's specific to a specific drug or substance. But here, they do account for intoxicated individuals. They do account for withdrawing individuals. So they have implemented and they have a policy in place. And as the judge mentioned, there have been, the plaintiff has not forecast any evidence that there's a policy practice or widespread custom at the jail of allowing these types of individuals to go untreated. Or since 2012, there have been no deaths. And again, they admitted that in a previous occasion, this policy was used to help price. So there is no dispute regarding the fact that the detention center has a policy and that they've even used it with a specific decedent here. Additionally, regarding the sheriff's statement that no one can keep all drugs out of a jail, that's not enough to forecast. We have some of these jail cases and some of them are quite horrible in terms of their neglect to the point of deliberate indifference. And the conditions there are bad and they lead to deliberate indifference. But as jails go, this one was pretty darn good. It has a policy and a detailed policy in place. This is the first time that this is the first incident of this sort that has occurred. And not only was a policy in place, but these people responded within minutes to the most obvious manifestation of a serious medical event, which was convulsing. And the standard that we are left with is a deliberate, not only deliberate indifference, but deliberate indifference to a serious medical need, which was not manifested. And when you read the record, you read the district court's careful exposition of this case. They were not on notice of a serious medical need and then to which they just sort of turned a cold, cold shoulder. Now, as I say, if you try to look at the universe of jails, this one is a whole lot better than many of the really alarming situations that we see in some jails. I wish most jails had these kinds of policies and that most jails would respond as quickly as this one did. We'd be a lot better off because there are a lot of jails that don't. And the situation is bad and the response time lags and sad consequences ensue. But this is not that case. Correct. And that is why it's a this is an appropriate summary judgment case, because we don't need a jury. There are no genuine disputes of material fact regarding this response time. It's on the record and it's clear the issue of notice. When did they have notice? You see it on camera. You see them respond quickly regarding the policies and practices. This is not a situation where a jail is ignoring someone who is in obvious need of help. So how do you get access to the fentanyl in the jail? There's been no determination of how that occurred. But both the experts seem to agree that it must have happened in the jail. Both of the experts agree that he must have taken the substance while he was at the jail. There is nothing on the record regarding how he obtained it. It is clear on the record that he was frisked, searched. He was asked to squat and cough and all the other processes. Did the experts speculate as to how he did? They don't speculate. Is there any circumstantial evidence as to how it happened? There is no circumstantial evidence. How do we take that and lighten what's favorable to him? What's the best way to look at that? The best way to look at that is that the plaintiff has... The proper way to look at it, I should say. The plaintiff has not established any record evidence whatsoever regarding how he obtained the drugs. There was no... It's unknown how he obtained the drugs. But under the expert testimony, it had to be taken... Timing of it means it had to be taken while he was there. It had to be taken while he was there. We don't know whether he obtained it. Where is Granville County? It is about an hour from the center of North Carolina, about an hour from Raleigh. What's in the county seat? I'd have to check that. It's on a map, right? Yeah. Neither one of us are from North Carolina. But anyway, it's in the Eastern District. We know that, but I didn't know... Somebody else might know that here. Yeah, so there... I apologize for that, but the plaintiff did not establish anything regarding how this was obtained. In another case, for example, let's say a counter-situation where the plaintiff had somehow... But we have to look at the facts, and the light was favorable to his side. Well, in the light... What is it... What do we take of it, in that way? Well, he took the drugs while he was in jail. That seems to be pretty well-established, but that doesn't establish a policy that they allow drugs in the jail. I'm not arguing about policy. I'm trying to get... I'm interested in the fact... Right. It doesn't appear... I couldn't find it in the record, and I thought maybe you could help me out, but... Yeah, there is nothing on the record regarding how he obtained the drugs, to answer your question. And there's no speculation as to how he did it? No speculation, nothing. Nobody has speculated? Okay. The only speculations that have occurred have been regarding when he would have... Not speculations, but the expert testimony of George Heim, which is a forensic toxicologist, who opined that he had taken the drugs at or near the time of the incident, which is relevant to the whole claim about the severe withdrawals. The evidence regarding the drugs and how they were obtained and when they were obtained are simply that he took them while he was there, at or near the time... Right, and if he had it, it was missed in a search of him. Correct. It was in his pocket or something. If he had it, it would have... He shouldn't have had access to it from any source other than himself, certainly.  And he shouldn't have had access to it from himself. Exactly, and they searched him, so that's undisputed. They searched him and they followed that protocol, so it wouldn't be in the light most favorable for the plaintiff that they just let him in with a drug and didn't do anything about it. It would be that somehow it got in, and somehow he was able to take it at or near the time of the incident, leading to the sudden convulsions. So it wasn't a death by a severe withdrawal. It wasn't death due to the withdrawal symptoms or anything of that nature. It was fentanyl toxicity on that morning that caused the severe convulsions, which led to his death, which is relevant to the notice issue, the fact that they didn't have any notice that this would occur on that morning in the sudden fashion that it occurred due to the amount. And that's the expert testimony of George Heim. I believe my time is up. Thank you. Let me ask my co-panelists if they have further questions. Bob, are you okay? I'm okay. We're okay, thank you. Thank you. You have some rebuttal time. I've got to address the policies, Your Honor. The policies that they have submitted to the court provide that the medical plan must be reviewed and signed by the sheriff, the Granville County Health Director, and the chairman of the Granville County Board of Commissioners annually. They have produced none of these. What they have produced instead is a draft policy that is unsigned by anyone that is dated 2020, more than a year after this incident occurred. There is nothing that shows that they complied with the North Carolina requirement that they have these policies, that they put them in writing, they signed them by all of the people, and they update them so that they are current to reflect the current medical knowledge. And medical knowledge changes all the time. Now, they didn't do that. What they have produced for you in all of their testimony relates to these unsigned draft policies. That's a violation of North Carolina law, and I don't see how this court can say that they get past summary judgment on deliberate indifference when they have not complied with the North Carolina state law. We asked for this in the discovery, and they didn't produce it. Wait, hasn't the Supreme Court said that failure to comply with policies or with state law is insufficient to show a constitutional violation, that those are separate questions? If they violated North Carolina state law, you might have a suit against them for violating North Carolina state law, but that doesn't mean they violated the Eighth Amendment, right? That might be true. I mean, the Supreme Court has literally said that, hasn't it? That might be true, but what it indicates is that they have not done what the North Carolina legislature has required them to do, which is to meet annually to update this policy with the medical director. In that meeting, the medical director and the sheriff would have met to say, we've got to meet again to update our policy, anything going on. The medical guy is going to say, well, there's medically assisted treatment. It's a program that has been adopted in more than half of the jurisdictions of the United States. It's cost effective, and it saves lives, and you ought to consider that. And what Judge Heitens says, if we were to somehow lump in and equate some sort of policy violation with a constitutional violation, which the Supreme Court has said do not do, because that would discourage states and localities from adopting policies in the first place. And you want them to adopt policies. You want them to have policies like this one in place. And the Supreme Court says if that equates to a constitutional violation, that's going to discourage localities from taking the initiative to develop policies. Those policies are a good thing. There is no evidence in the record that they ever adopted a policy. The evidence in the record only refers to a draft that occurred more than a year after all of these things occurred. And if they had complied with the law, this would have been signed, those meetings would have occurred, and they would have produced it for the court to consider. And the reason that this matters is that if they had been up to date, then they would have known that there was an opioid epidemic that was declared by the President and that they were going to be in the crosshairs and that they needed to make preparations to have medical treatment when they had inmates come in and that everyone that had this problem needed to be screened by a qualified medical person. And they did not do this. And this is what caused these injuries. It is direct. And it is a direct Monell violation. It is inadequate training and it's long been recognized as a Monell violation. And if they're entitled to qualified immunity, the officers are because they were not trained to recognize the symptoms and to act at an appropriate time and that the only time that they could be called upon to act is when the man was already in the final throes of death, then that's an inadequate policy, Your Honor. You seem to be ignoring the fact that you have the burden of proof as far as inadequate training and this and that. And I don't see that you carry that burden in anything like something that creates an issue of triable fact here. The opinion of the defendant's own expert witness saying that no one in the jail was trained to recognize these symptoms or to deal with this problem and that this was the reason why it happened and if they had had someone there, then he wouldn't have died, I think that's a prima facie case. Thank you, sir. Thank you very much, Your Honor. We will come down and greet counsel and then we will move into our second case.
judges: J. Harvie Wilkinson III, Robert B. King, Toby J. Heytens